UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DONDRAS L HOUSE,

        Plaintiff,

  v.

        Case No. 21-cv-0866-bhl

CITY OF MILWAUKEE, et al,

        Defendants.

## ORDER GRANTING SUMMARY JUDGMENT

There is scarcely a more conspicuous way to announce petty lawlessness than to settle beneath a "No Loitering" sign. Yet, on two separate occasions, *pro se* Plaintiff Dondras L. House did just that, and Milwaukee Police Department (MPD) officers took notice. House now claims it was his race, not his actions, that attracted police attention. He brings this lawsuit against the City of Milwaukee, the Milwaukee Fire and Police Commission, former MPD Chief Alfonso Morales[1], Sergeant Kathryn Anderer, and Officers Lorenzo Hernandez, Jr., Zachariah Wilber, and Joseph Laspisa, alleging violations of the Fourth and Fourteenth Amendments as well as Title VI of the Civil Rights Act of 1964. He also challenges the constitutionality of Milwaukee's municipal loitering ordinance. Defendants have moved for summary judgment on all claims. Because the ordinance is constitutional and House lacks evidence to support his claims, the motion will be granted.

### FACTUAL BACKGROUND[2]

On October 4, 2017, while on patrol, Milwaukee Police Department (MPD) Sergeant Kathryn Anderer and Officer Joseph Goggins (who is not a party in this case), spotted three individuals standing beneath a "No Loitering" sign posted outside Pride Food Store on West

---

[1] There is no dispute that Alfonso Morales had no direct involvement in this case and was not Chief of Police during any of the alleged incidents. He is, therefore, not a proper Defendant.

[2] These facts are drawn from Defendants' Proposed Findings of Fact, (ECF No. 55) and, to the extent permissible, House's Response and Additional Proposed Findings of Fact. (ECF No. 65.) Because several of House's responses and proposed facts are blatantly contradicted by the video evidence, those "facts" will not be accepted, nor construed in his favor. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

Brown Street. (ECF No. 55 at 2.) Officer Goggins pulled up alongside the store, and as he did, the three individuals attempted to depart. (*Id.*) But before they could scatter, he ordered them to return and produce identification. (*Id.*) One of the individuals proved wholly uncooperative and was taken into custody. (*Id.*) Another identified himself as Plaintiff Dondras L. House, a Black male. (*Id.*) Officer Goggins asked House why he had so flagrantly flouted the "No Loitering" sign and eventually issued him a citation for loitering in violation of Milwaukee Municipal Ordinance 106-31-1. (*Id.* at 2-3.) The entire interaction lasted about 15 minutes. (ECF No. 51-1.) House later pleaded "No Contest" and paid a $181 fine. (ECF No. 54-1.)

Nearly three years later, on September 15, 2020, MPD Officers Lorenzo Hernandez, Jr., Zachariah Wilber, and Joseph Laspisa were on patrol in a fully marked black and white MPD vehicle when they noticed House standing, for five to ten minutes, beside a "No Loitering" sign outside the Walgreens at 1400 E. Brady Street. (ECF No. 55 at 3-4.) As the officers approached him, House walked away. (*Id.* at 4.) They followed him for a few blocks, briefly lost sight of him, and then finally contacted him a few minutes later. (ECF No. 52-1.) House told the officers that he had not entered the Walgreens because he had loaned his facemask to a female companion, who confirmed that he had been standing outside of the store waiting for her. (ECF No. 55 at 5.) When the officers attempted to continue the conversation, House stated that he was not under arrest and went on his way. (*Id.*)

Shortly thereafter, as the officers were returning to their vehicle, House reappeared and initiated a second conversation. (*Id.* at 6.) He asked what the officers had wanted to say to him before. (*Id.*) The officers explained why they found some of his behavior suspicious and handed him a community contact card. (*Id.* at 6-7.) This second conversation lasted only about eight minutes, and House did not receive a citation. (*Id.* at 7.)

**LEGAL STANDARD**

"Summary judgment is appropriate where the admissible evidence reveals no genuine issue of any material fact." *Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(c)). Material facts are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and

unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (quoting 9 C. Wright & A. Miller, Fed. Prac. & Proc. Civ. §2529, pp. 300 (2d ed. 1995)). In other words, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citing Wright & Miller 299). Generally, disputes of fact are viewed in the light most favorable to the nonmoving party, *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000), but "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## ANALYSIS

House contends that Milwaukee Municipal Ordinance 106-31-1 violates the Fourteenth Amendment's fair notice requirement. He also brings claims under 42 U.S.C. Section 1983 for violations of the Fourth Amendment protection against unreasonable search and seizure and the Fourteenth Amendment Equal Protection Clause. And he alleges violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. Section 2000d et seq. Because the loitering ordinance is not unconstitutional and no rational jury could find that any defendant violated any of the constitutional or statutory provisions House invokes, summary judgment will be granted, and the case will be dismissed.

### I. Milwaukee Municipal Ordinance 106-31-1 Does Not Violate the Fourteenth Amendment's Fair Notice Requirement.

"'It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-3 (1966)). House argues that—like the Chicago loitering ordinance held unconstitutional in *Morales*—Milwaukee's loitering ordinance runs afoul of due process. He is not the first to think so. *See City of Milwaukee v. Nelson*, 439 N.W.2d 562 (1989). In *Nelson*, the Wisconsin Supreme Court interpreted and upheld Ordinance 106-31-1 against a constitutional challenge. But that occurred before *Morales*, which, as House underscores, recognized "the freedom to loiter for innocent purposes" as "part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment." *Morales*, 527 U.S. at 53. Thus, the question is whether, in light of *Morales*,

Milwaukee's ordinance obscures the conduct it means to prohibit and/or interferes with the right to loiter for innocent purposes. The Court holds that it does not.

The Chicago ordinance struck down in *Morales* had four predicate elements: (1) a police officer reasonably believed that at least one of two or more persons present in a public place was a criminal street gang member; (2) that person was "loitering," *i.e.*, "remaining in any one place with no apparent purpose;" (3) the officer ordered all persons to disperse; and (4) a person disobeyed the officer's order. *Morales*, 527 U.S. at 47. Milwaukee Municipal Ordinance 106-31-1, on the other hand, makes unlawful:

> LOITERING. Loiters or prowls in a place, at a time, or in a manner not usual for law-abiding individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity. Among the circumstances which may be considered in determining whether such alarm is warranted is the fact that the actor takes flight upon appearance of a peace officer, refuses to identify himself or manifestly endeavors to conceal himself or any object. Unless flight by the actor or other circumstances makes it impracticable, a peace officer shall prior to any arrest for an offense under this section, afford the actor an opportunity to dispel any alarm which would otherwise be warranted, by requesting him to identify himself and explain his presence and conduct. No person shall be convicted of an offense under this section if the peace officer did not comply with the preceding sentence, or if it appears at trial that the explanation given by the actor was true and, if believed by the peace officer at the time, would have dispelled the alarm.

MILWAUKEE, WIS., MORALS AND WELFARE, ch. 106, §31-1 (2018). A key distinction is that Milwaukee's ordinance does not criminalize merely "remaining in one place with no apparent purpose." The Supreme Court struck down Chicago's statute because it permitted conviction based on an officer's subjective ability to discern "an apparent purpose" and imperiled the right to loiter for innocent purposes. *See Morales*, 527 U.S. at 58. In other words, Chicago's ordinance reached "a substantial amount of innocent conduct" and "'provide[d] absolute discretion to police officers to decide what activities constitute[d] loitering.'" *Id.* at 60-61 (quoting *City of Chicago v. Morales*, 177 Ill.2d 440, 457 (1997)). Milwaukee's ordinance commits neither of these cardinal sins. First, Milwaukee's ordinance criminalizes only conduct that "warrant[s] alarm for the safety of persons or property in the vicinity." And it goes on to list certain objective factors, such as flight at the sight of police, that fetter the unusually apprehensive officer's discretion. *See Nelson*, 439 N.W.2d at 566-67. Moreover, a suspect cannot be convicted for loitering unless he is first given an opportunity to explain his presence and conduct. As a further check, "it is the trier of

fact," not the arresting officer, "who decides if the suspect's explanation 'would have dispelled any alarm.'" *Id.* at 567. Other courts have upheld similarly worded ordinances. *See Lyttle v. Killackey*, 546 F.Supp.2d 583, 595-96 (N.D. Ill. 2008); *State v. Stark*, 802 N.W.2d 165, 169-171 (S.D. 2011); *State v. Showens*, 845 N.W.2d 436, 442-49 (Iowa 2014). Though House draws attention to, and the Court acknowledges, the ugly history of loitering laws and their weaponization against the destitute, itinerant, and undesirable, that history is not implicated here, where the law in question is clearly written and outfitted with sufficient guardrails. House's Fourteenth Amendment due process claim must, therefore, fail.

## II. House's Fourth Amendment Claim Fails Because Officers Had Probable Cause to Believe That He Had Committed a Crime.

House also seeks to hold Defendants liable for allegedly unconstitutional searches and seizures that occurred during his two encounters with police. "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable," *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985), and House believes much of what he endured was objectively *un*reasonable.

House recalls Defendant Anderer pinning him against the Pride Food Store exterior and executing a frisk. (ECF No. 34 at 4.) While that was happening, he claims to have witnessed officers punch and body slam an underage patron who had just exited the store. (*Id.*) He suggests that the officers he spoke to outside of Walgreens reached for their weapons and later menacingly lingered around his car. (*Id.* at 5.) Some of this conduct might be unreasonable, but video evidence conclusively proves that none of it actually happened. (ECF Nos. 51-1; 52-3; and 52-6.) As a matter of fact, the video shows House was never even searched. (*Id.*) Because this objective evidence flatly disproves House's story, the Court must reject his version of events. *See Scott*, 550 at 380 (holding that courts should not adopt a version of facts plainly contradicted by the record). Excising House's fabrications, his case essentially boils down to a single, brief detention outside Pride Food Store. And because that detention was supported by probable cause, House has identified no Fourth Amendment violation.

Congress fashioned 42 U.S.C. Section 1983 to provide "a federal cause of action for the deprivation, under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (internal quotations omitted). Axiomatically, then, there is no cause of action in the absence of a deprivation. *See Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 19 (1981). And police conduct cannot deprive a citizen of his Fourth Amendment rights if it is

supported by probable cause. *See Schertz v. Waupaca Cnty.*, 875 F.2d 578, 582 (7th Cir. 1989). Thus, "the existence of probable cause for arrest is an absolute bar to [House's] Section 1983 claim." *Id.*

When they arrived on the scene on October 4, 2017, Sergeant Anderer and Officer Goggins observed House lounging beneath a "No Loitering" sign in an area known for high drug activity. (ECF No. 55 at 2.) As soon as he saw the officers, House took flight. (*Id.*) Under the circumstances, that was enough to "warrant alarm for the safety of persons or property in the vicinity." MILWAUKEE, WIS., MORALS AND WELFARE, ch. 106, §31-1 (2018). At this point, officers had at least reasonable suspicion—"more than a mere hunch"—that House had violated Municipal Ordinance 106-31-1. *United States v. Pace*, 48 F.4th 741, 749 (7th Cir. 2022). That entitled them to "stop and briefly detain [House] for investigative purposes." *Id.* They did so, and then, consistent with 106-31-1, asked House to identify himself and explain his presence and conduct. (ECF No. 55 at 2-3.) When his explanation (or lack thereof) failed to dispel any alarm, the police officially had probable cause to arrest. *See Gower v. Vercler*, 377 F.3d 661, 668 (7th Cir. 2004) ("Probable cause exists to arrest a suspect if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense.") (internal quotations omitted). Despite that, the officers chose simply to issue House a citation and then sent him on his way. (ECF No. 55 at 3.) Nothing about this interaction looks unreasonable, and no rational jury could conclude otherwise.

This is even truer of the more innocuous September 15, 2020 encounter. On that date, House twice interacted with MPD officers, but the first interaction was likely not even a seizure, and the second was consensual and initiated by House himself. For Fourth Amendment purposes, a seizure occurs only "when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). The question is "whether the officer's words and actions would have conveyed . . . to a reasonable person" "that he was being ordered to restrict his movement." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). During his first interaction with police on September 15, 2020, House was free to walk away, and, in fact, he does not dispute that he did. (ECF No. 55 at 5.) Nothing in the evidence suggests that any officer said or did anything that would have conveyed to a reasonable person "that he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), so

in all probability, no seizure occurred. Even if one did, it was supported by reasonable suspicion because House was, again, seen loitering below a "No Loitering" sign and fled when police approached. This time, though, House provided an excuse that dispelled alarm and, as Ordinance 106-31-1 requires, the police allowed him to go on his way. (ECF No. 55 at 5.) House actually instigated his second, even less constitutionally problematic, interaction with MPD officers on September 15, 2020, and that consensual encounter could not have amounted to a Fourth Amendment seizure. *See, e.g., United States v. Ahmad*, 21 F.4th 475 (7th Cir. 2021) (holding that even an officer's brief possession of a license and rental agreement did not transform an otherwise consensual encounter into a seizure).

House was neither illegally seized nor searched in violation of the Fourth Amendment on October 4, 2017 and September 15, 2020. Defendants motion for summary judgment as to this claim is therefore granted.

### III. House's Equal Protection Claim Fails Because He Cannot Show Discriminatory Effect and Purpose.

House next contends that MPD officers select their suspects, not based on clues of criminality, but race. If this were true, it would represent a serious violation of the Fourteenth Amendment's Equal Protection Clause. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."). House's problem is that he lacks evidence to satisfy the prerequisites of equal protection jurisprudence. "To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001). "To prove discriminatory effect, [plaintiffs] are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." *Id.* at 636. To prove discriminatory purpose, plaintiffs must show that a "'decisionmaker selected or reaffirmed a particular course of action at least in part "because of" its adverse effects upon an identifiable group.'" *Id.* at 645 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987)). House's evidence of discriminatory effect is sketchy at best, and his evidence of discriminatory purpose is entirely speculative.

House's only evidence of discriminatory effect is that, on September 15, 2020, MPD officers ignored White loiterers and zeroed in on him, the lone Black male lingering outside the Walgreens. Defendants argue that these White loiterers were materially different in one critical

respect—they never fled. As House himself has recognized, the Constitution protects the right to loiter for innocent purposes. *See Morales*, 527 U.S. at 53. That is why Ordinance 106-31-1 prohibits citation or arrest without specific outward indicators of suspicious activity, such as flight at the sight of police. Although this appears to be a case of unfortunate timing (House left the Walgreens exterior as police arrived but not *because* police arrived), the officers had no way of knowing that until they, as the ordinance requires, caught up to House and asked him to proffer an innocent explanation.

Obviously, if police officers have reasonable suspicion to stop only one out of a handful of individuals, those individuals are not similarly situated, and the race of the person detained is not evidence of discrimination. What creates some uncertainty in this case is that, perhaps unbeknownst to them, the MPD officers may have had reasonable suspicion to investigate the White loiterers too. Pursuant to Milwaukee Municipal Ordinance 106-31-6, it is a crime to loiter "without just cause . . . upon the property immediately adjacent" to "a restaurant, tavern, convenience store, filling station, or public building" "where 'no loitering' signs are posted." MILWAUKEE, WIS., MORALS AND WELFARE, ch. 106, §31-6 (2018). That raises the question: why, when faced with one ambulatory and several stationary suspects, did all three MPD officers follow the Black loiterer and leave the White loiterers undisturbed? It is true that police operate with some discretion, and some potentially law-breaking behavior must necessarily go uninvestigated and unpunished. *See Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887 (7th Cir. 2012). If, for instance, the Equal Protection Clause demanded that police cite either all speeders or none of them, no speeding tickets would ever be issued. *See Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 603-04 (2008). But the Fourteenth Amendment operates to disaggregate discretion and animus, and the prospect of animus is not so easily cast aside when the evidence reveals an overtly discriminatory effect.

That said, even if House can show discriminatory effect, he lacks anything indicative of discriminatory *intent*. Bare allegations of racism are not enough. *See Minority Police Officers Ass'n of S. Bend v. City of S. Bend*, 801 F.2d 964, 967 (7th Cir. 1986). He needs to come forward with evidence that MPD officers selected "a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *McCleskey*, 481 U.S. at 298 (internal citations omitted). He has not done so. If the MPD defendants actually saw House as a vehicle for racial discrimination, they would likely not have permitted him to walk away after

a minute-long conversation. (ECF No. 55 at 5.) House claims that he has the officers "on video enforcing the no loitering law as if it were a 'Black Code' or 'Jim Crow' law." (ECF No. 62 at 6.) The problem with this assertion is that the officers specifically did *not* enforce the loitering law on this occasion. After brief questioning, they allowed House to go on his way. Nor did any officer make a racially insensitive or prejudicial remark. Moreover, the record confirms that House himself initiated the second conversation with the officers, and they affirmatively disclaimed any racial bias, explaining that they focused on House because he walked away while the other loiterers did not. (*See* ECF No. 53-4.) Even taken in the light most favorable to House, this evidence would not permit a reasonable jury to find discriminatory intent, so House's equal protection claim fails.

### IV. House's Title VI Claim Also Fails.

Finally, House alleges that Defendants violated Title VI of the Civil Rights Act of 1964. Title VI states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d. The operative complaint appears to raise this claim against *all* Defendants, but even as a theoretical matter, it could only be properly brought against one: the Milwaukee Fire and Police Commission. The City of Milwaukee is exempt because it does not fall within Title VI's definition of a "program" or "activity;" it is a full-blown municipality. *See Smith v. City of Chicago*, 143 F.Supp.3d 741, 758 (N.D. Ill. 2015); *see also Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991) (affirming dismissal of a Rehabilitation Act claim on the same grounds). For similar reasons, individual defendants cannot be held liable for violations of Title VI. *See C.S. v. Couch*, 843 F.Supp.2d 894, 906 n.14 (N.D. Ind. 2011) (citing *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1019-21 (7th Cir. 1997)).

As for the claim against the Milwaukee Fire and Police Commission, "Title VI itself directly reache[s] only instances of intentional discrimination." *Alexander v. Choate*, 469 U.S. 287, 293 (1985). Thus, Title VI includes "an implied private right of action for both injunctive relief and damages" against appropriate entities engaged in intentional discrimination, *Ind. Prot. and Advoc'y Servs. v. Ind. Fam. and Soc. Servs. Admin.*, 603 F.3d 365, 376 (7th Cir. 2010), but it "does not include a private right to enforce [disparate-impact] regulations." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Because he has no evidence of discriminatory intent, House

has no ability to invoke Title VI's private right of action against the Milwaukee Fire and Police Commission, so his Title VI claim must also fail.

And even if he had a private right of action for prospective relief under Title VI, House has not identified any policy of the Milwaukee Police and Fire Commission that promotes a discriminatory effect. At most, he has described a single instance, on September 15, 2020, where three MDP officers may have behaved in a way that had an unintentional discriminatory effect. This is insufficient to prove a Title VI claim. *See Craft v. Bd. of Trs. of Univ. of Ill.*, 793 F.2d 140, 142 (7th Cir. 1986) (requiring proof of intentional discrimination in Title VI claims).

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment, ECF No. 49, is **GRANTED**, and the case is **dismissed**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin on November 4, 2022.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge